E-FILED
Monday, 28 September, 2026 11:44:21 AM
Clerk, U.S. District Court, ILCD

**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION**

| | | |
|---|---|---|
| **THOMAS RAYMOND,** <br> **Plaintiff,** <br><br> **v.** <br><br> **BOARD OF TRUSTEES SOUTHERN ILLINOIS UNIVERSITY,** <br> **Defendant.** | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) | **Case No. 24-cv-3361** |

**OPINION**

**COLLEEN R. LAWLESS, United States District Judge:**

Plaintiff Thomas Raymond alleges Defendant Southern Illinois University unlawfully discriminated against him under the Americans with Disabilities Act ("ADA"), 42 U.SC. § 12112(a). For the reasons that follow, Defendant's Motion for Summary Judgment is GRANTED.

## I. FACTUAL BACKGROUND[1]

Plaintiff Thomas Raymond was hired as an Office Manager in the Office of the SIU Foundation at Southern Illinois University on February 7, 2022. (Doc. 1, ¶ 1). Upon being hired as Office Manager, Plaintiff was provided with a position description. The position description outlines the skills and abilities needed for the Office Manager position including, but not limited to, maintaining a professional appearance and positive attitude as the face of the Foundation and Telehealth offices; having the ability to work

[1] Unless otherwise noted, the factual background of this case is drawn from the undisputed facts as conceded to in Defendant's statement of material facts; Plaintiff's response to Defendant's statement of material facts and additional material facts; Defendant's reply to Plaintiff's additional facts; and exhibits to the filings.

independently and accurately under pressure while often managing multiple high priorities; and demonstrating tact and diplomacy and maintaining a positive approach while exercising good professional judgment. (Doc. 13, ¶ 2). Prior to commencing his position with SIU, the only potential disability Plaintiff intended to identify was his colon cancer diagnosis. Prior to September 13, 2022, Plaintiff only requested accommodations related to his cancer diagnosis. (*Id.* at ¶ 3).

Plaintiff perceived his three-month probationary evaluation from his supervisor, Jacquelyn Donohoo, as a positive evaluation of his performance. (*Id.* at ¶ 4). Plaintiff generally had a good professional relationship with the people he worked with including, but not limited to, Ms. Donohoo and the Foundation's Executive Director, Hal Smith. Plaintiff perceived only one co-worker's actions as harassing and belittling during his employment with SIU. Plaintiff admits that the co-worker was never told about Plaintiff's history of mental health problems and never teased Plaintiff in any respect regarding his cancer diagnosis. Plaintiff reported this behavior prior to September 13, 2022. (*Id.* at ¶ 5). Plaintiff agrees that none of his co-workers from SIU made any derogatory comments or harassed him in any way regarding his disabilities. (*Id.* at ¶ 6).

In August of 2022, Plaintiff applied for and interviewed for a different position at SIU, the Events Administrative Associate position. (*Id.* at ¶ 7). On September 12, 2022, Plaintiff was informed he would not advance to second round of interviews for the new position. Donohoo noticed that Plaintiff took the news very hard and had a difficult time processing it. Donohoo approved Plaintiff's request to leave early that day while noticing he had a red face and tears in his eyes. (*Id.* at ¶ 8).

Plaintiff returned to work the following day wherein Donohoo noticed Plaintiff continued to appear distraught. When Plaintiff visited Donohoo's office that morning, he became emotionally overwhelmed and began crying, expressing to Donohoo that he was distraught over not getting the new position. Donohoo told Plaintiff she fully supported his career aspirations and encouraged him to continue applying for the positions that interested him. Plaintiff told Donohoo he was experiencing stress in his life due to financial struggles and having "severe anxiety, depression, and PTSD." He said it was "going to be hard to come into the office every day, put on a smiling face and be the positive person everyone needs." This is the first time Donohoo was made aware of Plaintiff's mental health issues. (*Id.* at ¶ 9). Plaintiff has no recollection of such a conversation, stating "I honestly do not remember that morning talking with her." (Doc. 19, Pl. Resp. ¶ 9).

Based on Donohoo's concern over Plaintiff's state of mind and her good faith believe Plaintiff might be a risk to himself or others, she called Jessica Derhake, SIU's Director of Labor and Employee Relations. Derhake told Donohoo she would come to Plaintiff's office to speak to him. (Doc. 13, ¶ 10). Plaintiff claims there is a factual dispute as to whether Donohoo actually believed Plaintiff might be a risk to himself or others. (Doc. 19, Resp. ¶ 10).

Upon her arrival at 11:00 a.m., Derhake briefly spoke to Plaintiff near his desk in the open office area of the Foundation before moving to a conference room. (*Id.* at ¶ 11). Plaintiff has very little recollection of his discussion with Derhake in the Foundation's conference room. He recalls sitting on the floor of the conference room and being

concerned that he might be overheard by coworkers. (*Id.* at ¶ 12). Plaintiff also recalls Derhake attempted to get in touch with Plaintiff's therapist or psychiatrist and when she was unsuccessful in reaching either, she suggested Plaintiff go with her to the Human Resources office to possibly wait for someone there to talk with him. Plaintiff agreed to go with Derhake as her office would be more private. They walked together to the Human Resources office about two blocks away. (*Id.* at ¶ 13). While at the Human Resources office, Plaintiff saw SIU police officers and testified Derhake told him that "you are going to the ER in handcuffs or walk with them." (*Id.* at ¶ 16).

Defendant alleges that, upon exiting the office into the hall where the SIU officers and Hal Smith were present, Plaintiff fell to the floor into a fetal position as he rocked back and forth while repeating something unintelligible. (Doc. 13, ¶ 17). Plaintiff disputes the allegation and claims he briefly fell to the floor due to the stress of the police presence. (Doc. 19, Resp. ¶ 17). While Plaintiff was walking with Derhake and SIU officers en route to the Springfield Memorial Hospital Agency, SIU police did not tell Plaintiff he was free to leave, place their hands on him, or place him in handcuffs. (*Id.* at ¶ 18). Plaintiff was evaluated and discharged from the ER shortly thereafter. He called Donohoo that afternoon and told her he had been escorted to the ER by the SIU police and would not return that day. (*Id.* at ¶ 19).

Based on Plaintiff's behavior that Smith personally witnessed in the HR office as well as Plaintiff's behavior in the Foundation's office as reported to her by Derhake, Smith placed Plaintiff on paid administrative leave pending an assessment on whether Plaintiff could perform the essential functions of his job safely and effectively. (*Id.* at ¶ 20). During

the afternoon of September 13, 2022, Donohoo called Plaintiff to inform him that he was being placed on paid leave for the rest of that week. Donohoo clearly informed Plaintiff that he was not being disciplined and the leave time would not come out of his personal benefit time. Defendant contends Plaintiff was placed on paid administrative leave solely because of his actions on September 13, 2022, and the uncertainty surrounding his ability to perform the essential functions of his job safely and effectively. (*Id.* at ¶ 21). Plaintiff disputes this allegation on the basis he was almost immediately released from the hospital and could not have posed a danger to himself or others. (Doc. 19, Resp. ¶ 21).

On September 14, 2022, Derhake advised Plaintiff via email that he was placed on paid leave status through the end of the week while SIU assessed the situation and she would contact him to discuss the timing and conditions for his return to the office. (Doc. 19, ¶ 22). Two days later, Derhake sent Plaintiff an email informing him that because of the behavior he had exhibited on Monday and Tuesday, he would remain on paid leave pending a fitness for duty evaluation and a physician release to fully return to work. At all relevant times, the University had policies authorizing fitness for duty examinations and certifications to verify an employee's ability to perform the essential functions of his position when returning to work following release by the employee's own physician. (*Id.* at ¶ 23).

Around September 27, 2022, Plaintiff attempted to file a union grievance relating to the events of September 13, 2022, but he did not file one based on the Union's advice. (*Id.* at ¶ 24). Plaintiff underwent an independent psychological evaluation by Dr. Thomas Campion on December 2, 2022. (*Id.* at ¶ 25). On January 17, 2023, Plaintiff was provided

a copy of Dr. Campion's report along with a letter from Shelby Kaiser, Director of Employee Benefits, outlining the requirements for Plaintiff's return to work. Kaiser's letter also advised Plaintiff he was being removed from paid administrative leave and would be placed on a 30-day leave using his benefit time. (*Id.* at ¶ 26). The letter further advised Plaintiff that the "Independent Psychological Evaluation indicates significant issues of whether you are able to return to work and satisfactorily perform the requirements of your job position classification." Specifically, Dr. Campion raised the following issues: 1) Plaintiff's use of marijuana 3-4 times per day (SIU is a drug-free workplace); 2) Plaintiff's desire to work from home (impractical given the job responsibilities); 3) Plaintiff "continues to be in an emotionally fragile state;" 4) Plaintiff "continues to have a poor frustration tolerance and ability to manage his emotions;" 5) Plaintiff's "ability to return to work and maintain a professional appearance and positive attitude is unlikely;" and 6) Plaintiff's "ability to demonstrate tact and diplomacy and maintain a positive approach while exercising good professional judgment is unlikely as well" and "[a]dditional stress to [Plaintiff] only further exacerbates the issue." (*Id.* at ¶ 27).

Plaintiff continued to work with his therapist and psychiatrist, Robert Glatz and Dr. Shrestha, throughout the winter of 2022 and 2023. Plaintiff submitted letters from both providers releasing him to return to work in mid-February 2023. (Doc. 13, ¶ 28). Even after Plaintiff submitted said letters, Defendant told him it was "continuing to assess whether you are able to return to work." (Doc. 19, ¶¶ 13, 17). On March 3, 2023, Kaiser sent Plaintiff a letter which, in part, informed him that during his leave "as of February

1, 2023, the Office of Development and Office of Alumni Affairs merged into one office—Office of Development and Alumni Relations" and, accordingly, "the Office Manager role (and others) was eliminated in accordance with this organizational restructure." (*Id.* at ¶ 29). Prior to being placed on leave, Plaintiff knew the University was planning to combine the Office of Alumni Affairs and Office of Development into one single office. (*Id.* at ¶ 30). Kaiser's letter also indicated that SIU-SOM is "prepared to review other positions" for which Plaintiff was qualified to apply, including "some work-from-home positions." (*Id.* at ¶ 31).

Defendant began planning for the combination of the Office of Alumni Affairs and Office of the Foundation in 2020, following a trend among universities to combine those two functions which both involved similar constituencies. (*Id.* at ¶ 38). The combination of those two offices became effective on February 1, 2023, resulting in the elimination of several positions and the creation of new positions. (*Id.* at ¶ 39). The Office Manager position held by Plaintiff was one of three administrative positions within the two combined offices that was eliminated, with a new Office Administrator position created to assume the duties of the three combined positions. (*Id.* at ¶ 40). The Office Administrator position is a step higher than Office Manager within the University Civil Service rankings, with additional required qualifications. Thus, the new position was required to be posted and hired through the civil service process such that Plaintiff could not be transferred into the new rank. (*Id.* at ¶ 41). The elimination of Plaintiff's position did not consider the identity of the current occupant of that position, nor did it consider in any respect whether that occupant had or was perceived to have a disability. (*Id.* at ¶

42). Plaintiff states he was told the merger was to better facilitate the development of donations but neither his "position nor anybody else's was going to be eliminated, that they would just be reorganized." (Doc. 20, ¶ 14). Executive Director Hal Smith told Plaintiff there would not be a reduction in force and he would not lose his position because of the merger. (*Id.* at ¶ 15).

On March 17, 2023, Human Resource Associate Kim Kinsell sent a letter to Plaintiff identifying civil service classification postings for which Plaintiff qualified to test. (Doc. 13, ¶ 32). Plaintiff was a member of the AFSCME union. (Doc. 20, ¶ 18). Plaintiff, working with his union representative, expressed an interest in the Staff Secretary (Office Manager) position listed in Kinsell's letter. Despite this, Plaintiff never applied to SIU for any of the posted positions. (Doc. 13, ¶ 33). However, Plaintiff was still actively seeking other employment outside of SIU including through the State system at that time. In May of 2023, SIU received notice that Plaintiff was offered employment with the Illinois Department of Innovation and Technology ("DoIT"). On May 16, 2023, Kaiser requested Plaintiff sign and return a separation form for the purpose of transferring Plaintiff's insurance information to DoIT. (*Id.* at ¶ 34).

On May 17, 2023, Plaintiff returned his completed separation notice and informed Kaiser he was resigning from SIU-SOM effective May 15, 2023, based on his employment at another state agency. Defendant alleges Plaintiff admits he was not terminated by SIU. (*Id.* at ¶ 35). In response, Plaintiff acknowledges that while the preceding statement is largely true, it is misleading given he was never allowed to return to work and was not receiving compensation. (Doc. 19, Resp. to ¶ 35). Defendant alleges it is undisputed that

no one commented about Plaintiff's disabilities from the time Plaintiff was placed on administrative leave on September 13, 2022, to his resignation date of May 15, 2023. (Doc. 13, ¶ 36). Plaintiff contends that while no one may have "commented on" Plaintiff's disabilities, Defendant obviously believed he had a mental health issue because Defendant's representatives forced him to go to the emergency room against his will and refused to return him to work after Dr. Campion's report. (Doc. 19, Resp. to ¶ 36). Plaintiff filed his discrimination charge against SIU with the Illinois Department of Human Rights on October 10, 2023. (Doc. 13, ¶ 37).

## II. DISCUSSION

Plaintiff contends, based on Defendant's perception that he was disabled due to his mental health issues, Defendant engaged in a pattern of discrimination against him—including workplace harassment, forcing him to the emergency room, removing him from the workplace, eliminating his position, and a constructive discharge. (*Id.* at ¶ 15). Plaintiff argues his mental health conditions did not prevent him from working.

Defendant argues summary judgment is appropriate with respect to the events of September 13, 2022 and surrounding dates, because there is no factual dispute that Plaintiff's charge of discrimination was filed more than 300 days after those alleged adverse employment actions.[2] (Doc. 13 at 2). Even without a timeliness issue, Defendant asserts the undisputed facts show its actions on that day were in response to Plaintiff's conduct and not any perceived disability. (*Id.*) Defendant further contends the

---

[2] Because Plaintiff filed his charge on October 10, 2023, any adverse actions occurring before December 14, 2022 would fall outside the 300-day period.

undisputed facts show that the elimination of Plaintiff's office manager position was part of a previously planned reorganization which created new positions and eliminated others. (*Id.*) Defendant argues no evidence shows that the reorganization and resulting elimination of Plaintiff's position was a pretext to terminate Plaintiff because of a perceived disability. In fact, Plaintiff decided not to apply for other positions offered by Defendant and obtained employment at another state agency at a higher salary.

In response, Plaintiff claims he has alleged a continuing violation, and his September 2022 claims are not time-barred. Plaintiff outlines several critical dates and occurrences that are central to his ADA claim: (1) September 12, 2022: Plaintiff was told he was not going to get the job he was seeking and left work early; (2) September 13, 2022: Plaintiff was directed to go to the emergency room following his interaction with Jessica Derhake; (3) September 14, 2022: Plaintiff was placed on administrative leave; (4) September 16, 2022: Plaintiff was told to take a fitness-for-duty evaluation; (5) January 17, 2023: Dr. Campion's report was released and Plaintiff was taken off administrative leave; (6) February 13 and 17, 2023: Plaintiff was released to return to work by his physicians; (7) March 3, 2023: Plaintiff was notified that his position was eliminated on February 1, 2023, and he was not allowed to return to work; (8) May 17, 2023: Plaintiff submitted a separation notice to Defendant; and (9) October 10, 2023: Plaintiff filed his EEOC charge. Because Plaintiff was not permitted to return to work upon being cleared to do so and his position was subsequently eliminated, Plaintiff alleges he can establish a prima facie case under the ADA. (*Id.* at 21-26).

**A. Summary Judgment Standard**

Summary judgment is appropriate under Rule 56 if the "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Metzler v. Loyola University Chicago*, 164 F.4th 612, 616 (7th Cir. 2026) (citations omitted). The Court construes all facts and draws all reasonable inferences in favor of the non-movant. *Id.* In considering whether summary judgment is warranted, the Court does not weigh evidence, resolve credibility disputes, or choose between competing factual narratives. *Johnson v. Edwards*, 164 F.4th 1074, 1079 (7th Cir. 2026). The moving party may prevail "by showing an absence of evidence to support the non-movant's claims." *Metzler*, 164 F.4th at 616.

**B. Timeliness of Plaintiff's Charge of Discrimination**

"Because the ADA's enforcement provision expressly incorporates § 2000e-5 of Title VII, claims for discrimination under the ADA must also be filed within 300 days after the alleged unlawful unemployment practice occurred." *Stepney v. Naperville Sch. Dist.*, 392 F.3d 236, 238 (7th Cir. 2004) (internal quotation marks omitted). "The 300-day limit . . . begins to run when the defendant has taken the action that injures the plaintiff and when the plaintiff knows she has been injured, not when she determines that the injury was unlawful." *Sharp v. United Airlines, Inc.*, 236 F.3d 368, 372 (7th Cir. 2001) (internal quotation marks and citations omitted). Here, the first four critical dates identified by Plaintiff—with occurrences between September 12 and 16, 2022--are outside

the 300-day period. Plaintiff contends those early occurrences are saved by the continuing violation doctrine.

Courts have analyzed the application of the continuing violation doctrine in the context of ADA lawsuits. *Teague v. Northwestern Memorial Hosp.*, 492 F. App'x 680, 684 (7th Cir. 2012). This enables courts to look outside the relevant time period. *Dandy v. United Parcel Serv., Inc.*, 388 F.3d 263, 270 (7th Cir 2004). The Seventh Circuit has recognized three different ways an employee may show a continuing violation: (1) when the employer makes employment decisions over time that make it difficult to determine the precise date of discrimination; (2) when the employer has an express discriminatory policy; and (3) when discrete acts of discrimination are part of an ongoing pattern and at least one such act occurred within the relevant limitations period. *Tinner v. United Ins. Co. of America*, 308 F.3d 697, 707 (7th Cir. 2002).

As Defendant correctly notes, Plaintiff cannot rely on the first method because he points to the precise dates of Defendant's alleged violations. Plaintiff does not argue that Defendant has an express discriminatory policy. Thus, Plaintiff contends Defendant's discrete acts are part of an ongoing pattern, at least one of which occurred within the 300 day-period. The continuing violation doctrine does not revive injuries falling outside of the limitations period. *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002). It instead applies only when a claim does not accrue until multiple events are grouped together, with the last event being timely. *Id.* at 115-17. A new injury cannot be used to "bootstrap" lingering effects of untimely injuries. *See Limestone Dev. Corp. v. Vill. of Lemont, Ill.*, 520 F.3d 797, 801-02 (7th Cir. 2008).

Plaintiff argues the events that occurred before December 14, 2022—his interaction with Derhake, his placement on administrative leave, and the requirement he meet with Dr. Campion—constitute continuing violations on which he may proceed. However, each of these occurrences are discrete acts that occurred more than 300 days before Plaintiff filed his charge. The acts are not part of an ongoing pattern with acts that are timely. Plaintiff cannot reach back to timely occurrences to establish a continuing violation for untimely ones. These were individual discrete acts that Plaintiff, "with the exercise of reasonable diligence should have known, that each act, once completed, was [allegedly] discriminatory." *See, e.g., Tinner*, 308 F.3d at 708; *Morgan*, 513 U.S. at 102 ("discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges. Each discrete discriminatory act starts a new clock for filing charges alleging that act."). Therefore, the Court finds the continuing violation doctrine does not apply to the three alleged discriminatory acts that occurred more than 300 days prior to Plaintiff filing the charge. Defendant is entitled to summary judgment on those three claims.

**C. Prima Facie Case of Disability Discrimination**

The ADA prohibits a covered employer from "discriminat[ing] against a qualified individual on the basis of disability." 42 U.S.C. § 12112(a). A plaintiff seeking to establish disability discrimination under the ADA must show that "(1) he is disabled; (2) he is otherwise qualified to perform the essential functions of the job with or without a reasonable accommodation; and (3) his disability caused the adverse employment action." *Jezior v. City of Chicago*, 179 F.4th 569, 576 (7th Cir. 2026) (citation omitted). In

determining whether summary judgment is warranted, courts consider whether the evidence, taken in the light most favorable to the plaintiff, would allow a reasonable factfinder to determine that the disability caused her termination. *Schoper v. Bd. of Trustees of Western Ill. Univ.*, 119 F.4th 527, 534 (7th Cir. 2024).

A qualified individual is one who "can perform the essential functions of the employment position" either "with or without a reasonable accommodation." 42 U.S.C. § 12111(8); *see also Li v. Fresenius Kabi USA, LLC*, 110 F.4th 988, 995 (7th Cir. 2024). "An inability to do the job's essential tasks means that one is not 'qualified'; it does not mean that the employer must excuse the inability." *Li*, 110 F.4th at 995. The plaintiff "bears the initial burden of establishing that she was a qualified individual who could perform the essential functions of her position," before then "show[ing] that her employer was aware of her disability but failed to afford her a reasonable accommodation." *Id.*

The parties agree Plaintiff has established he is disabled. Turning to the second element, Plaintiff contends there is nothing to suggest he was unable to perform his job duties after he was released from the hospital. Plaintiff alleges Defendant knew he was released from the hospital almost immediately and presented no danger to himself or anyone else. As previously stated, any event or occurrence before December 14, 2022—including Plaintiff's placement on administrative leave on September 14, 2022, the September 16, 2022 requirement that he receive a fitness-for-duty evaluation, and Dr. Campion's December 2, 2022 psychological evaluation—is untimely because each occurred more than 300 days before Plaintiff filed his discrimination charge on October 10, 2023. Based on Plaintiff's arguments, it appears the first occurrence to fall within the

300-day period is when Plaintiff had not yet been permitted to return to work on or about December 14, 2022. Therefore, the Court will consider whether the fact that Plaintiff was not permitted to return to work by that date constitutes disability discrimination.

To the extent Plaintiff alleges he should have been permitted to return to work on or about December 14, 2022, Defendant contends Plaintiff cannot show he was qualified to perform the essential functions of his job either with or without reasonable accommodation. "The term 'qualified,' with respect to an individual with a disability, means that the individual satisfies the requisite skill, experience, education, and other job-related requirements of the employment such individual holds or desires and, with or without reasonable accommodation, can perform the essential functions of such position." 29 C.F.R. § 1630.2(m). "That determination should be based on the qualified disabled individual's capabilities at the time of the employment decision." *Duda v. Bd. of Educ. of Franklin Park Pub. Sch. Dist.*, 133 F.3d 1054, 1059 (7th Cir. 1998). Based on his hiring and past performance, there is no dispute Plaintiff had the "requisite skill, experience, education, and other job-related requirements" to perform his job on December 14, 2022. Defendant alleges he could not perform all of the essential functions.

By December 14, 2022, Plaintiff had undergone the independent psychological evaluation by Dr. Campion, but the results had not yet been received by Plaintiff.[3] While the report is dated December 7, 2022, Plaintiff did not receive the report until January 17,

[3] The parties dispute whether Defendant was authorized under 42 U.S.C. § 12112(d)(4)(A) to order a fitness for duty evaluation and a physician release before allowing Plaintiff to return to work. Once again, this decision by Defendant on September 16, 2022, predates Plaintiff's filing of the charge by more than 300 days and is untimely.

2023. The Court will presume Defendant received the report no later than December 14, 2022, and will consider whether Defendant was qualified to perform the essential functions of his job on that date. Dr. Campion's report notes that, while Plaintiff is unlikely to become violent and has no history of violence, Plaintiff has "poor frustration tolerance and ability to manage his emotions." (Doc. 14). Moreover, "[h]is ability to return to work and maintain a professional appearance and positive attitude is unlikely." (*Id.*) The report also finds it unlikely that Plaintiff would be able to "demonstrate tact and diplomacy and maintain a positive approach while exercising good professional judgment." (*Id.*) Dr. Campion also opined that stress associated with the job "further exacerbates the issue" and recommended Plaintiff "seek[] a position with limited interpersonal connections" and with a "single, direct supervisor . . . who is relational and empathetic." (*Id.* at 12).

While Dr. Campion's report addresses challenges, Plaintiff contends it did not conclude Plaintiff was unable to work. On January 17, 2023, Plaintiff was notified that based on Dr. Campion's report he was being removed from paid administrative leave, placed on a 30-day approved leave of absence using his benefit time, and informed of conditions he must meet to return to work. Based on these facts and that he was now being financially impacted, Plaintiff alleges a jury could find that Defendant's refusal to allow him to return to work violated his rights under the ADA. The Court disagrees. A fair reading of Dr. Campion's report—particularly the passages quoted in the preceding paragraph—demonstrates that Defendant had an eminently reasonable basis to conclude Plaintiff was unable to return to his office manager position at that time.

Plaintiff also suggests that the elimination of his position on February 1, 2023, is too coincidental and, if the decision was actually made on that date, he would have been notified at that time. Instead, Plaintiff was not informed of the merger until March 3, 2023. At first glance, the timing may appear suspicious. However, Plaintiff admits that paragraphs 38 through 42 of Defendant's alleged facts are undisputed. Said paragraphs are supported by the sworn Declaration of Lori Williams, the Associate Provost of External Relations for the SIU School of Medicine. Ms. Williams states that planning for the combination of the two offices began in 2020 and the merger resulted in the elimination of several positions and the creation of new positions. Plaintiff's office manager position "was one of three administrative positions within the two combined offices that were eliminated," and a newly created office manager position assumed the duties of the eliminated positions.[4] (Doc. 13, ¶ 40). Williams also stated that, because the new office manager position was a higher rank and included additional qualifications from Plaintiff's office manager position, the position was required to be posted and included a hiring process that would not have allowed Plaintiff to transfer into the new position. Finally, "[t]he elimination of Plaintiff's position did not consider the identity of the then current occupant of that position, nor did it consider in any respect whether that occupant had or was perceived to have a disability." (*Id.* at ¶ 42). Because Plaintiff has admitted that the planning for the elimination of Plaintiff's position occurred long before

---

[4] Plaintiff testified in his deposition that several months prior to the reorganization, he was told by Hal Smith that his office manager position would not be eliminated. However, this statement constitutes inadmissible hearsay and Plaintiff points to no admissible evidence supporting the assertion.

February 1, 2023, and well before the events of September 13, 2022, Plaintiff cannot show that his position was eliminated because of his disability, even when all facts and reasonable inferences are construed in his favor.

It is also worth noting that Shelby Kaiser's March 3, 2023 letter indicated that Defendant was prepared to review other positions for which Plaintiff was qualified, including some work-from-home positions. On March 17, 2023, HR sent Plaintiff a letter noting several positions for which he was qualified to test. While Plaintiff expressed an interest in the listed staff secretary or office manager positions, Plaintiff did not apply for that or any other position with Defendant. Instead, Plaintiff was seeking other employment and obtained a job in May 2023 through the state system. Defendant's correspondence with Plaintiff from March 3, 2023, until the date he accepted a position with DoIT, demonstrates Defendant attempted to accommodate Plaintiff's disability. Therefore, Plaintiff cannot establish a prima facie case of disability discrimination.

## III. CONCLUSION

Accordingly, Defendant's Motion for Summary Judgment (Doc. 13) is GRANTED. Plaintiff's claims are Dismissed with Prejudice. The Clerk will enter judgment and terminate this case.

ENTER: September 28, 2026

COLLEEN R. LAWLESS
UNITED STATES DISTRICT JUDGE